UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

Case No. 19-cr-20190

Plaintiff,

Hon. Matthew F. Leitman
United States District Judge

v.

BRANDON M. EDWARDS,

Defendant.

---

## United States' Response Opposing the Defendant's Motion for Compassionate Release

Brandon Edwards was convicted of possessing a firearm as a felon based on a prior armed robbery conviction. He showed up to a drug deal with an undercover officer carrying a loaded firearm. For this, the Court sentenced him to 24 months' imprisonment. He began serving that sentence a little over four months ago, on June 30, 2020. Yet he now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

1

Edwards does not qualify for compassionate release because he does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Edwards does not have a condition that places him at higher risk from Covid-19. His offense conduct and his criminal history show that he is a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release here.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Edwards, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates

face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of November 11, this process has already resulted in at least 16,840 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at \*11—the Court should deny Edwards's motion for compassionate release.

## Background

The grand jury indicted Edwards for possessing a firearm as a felon. (PSR ¶ 1). The Magistrate released Edwards on bond pending trial. (PSR ¶ 3). On June 27, 2019, he pleaded guilty under a Rule 11 agreement to the one charge in the Indictment. (PSR ¶ 4). In January 2020, the Court sentenced Edwards to 24 months in prison. (ECF No. 19, PageID.90–91).

He reported to the Bureau of Prisons to begin serving his sentence on June 30, 2020, and has now served a little over *four months*—or less than one quarter of his term. (Ex. 1). He is currently incarcerated at FCI Milan. *Id.* He is 30 years old, and his projected release date is

March 6, 2022. *Id.* His underlying medical condition is asthma.

Edwards has moved for compassionate release, citing his medical

condition and the Covid-19 pandemic. As for asthma, he has exhausted

his administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's

spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-

3447, 2020 WL 3056217, at \*2 (6th Cir. June 9, 2020). For over almost a

decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of

Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL

3056217, at \*2.

On March 13, 2020, the Bureau of Prisons began modifying its

operations to implement its Covid-19 Action Plan and minimize the risk

of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP

Covid-19 Modified Operations Website. Since then, as the worldwide

crisis has evolved, the Bureau of Prisons has repeatedly revised its

4

plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone

allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

6

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 16,800 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

7

3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious

offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now

9

and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Edwards's motion for compassionate release.

Edwards's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529

10

F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion, which Edwards has done here for asthma. (ECF No. 24, PageID.111–114.)

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

11

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Edwards is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of

13

the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Edwards and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

***Asthma***. Edwards's asthma likewise does not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Section 1B1.13 cmt. n.1 defines a medical condition that constitutes an extraordinary and compelling reason as either a terminal illness, or a serious medical condition that substantially diminishes his ability to provide self-care in

14

prison from which he is not expected to recover. Intermittent or mild asthma alone does not render a defendant eligible for compassionate release. *See United States v. Brown*, No. 19-20202, 2020 WL 2812776, at *4 (E.D. Mich. May 29, 2020) (Defendant's mild asthma, young age, and otherwise good health do not demonstrate "extraordinary and compelling reasons" for release); *United States v. Files*, No. CR 17-20362, 2020 WL 4435170, at *3 (E.D. Mich. Aug. 3, 2020) (denying compassionate release motion because defendant's mild asthma was managed with prescription medication); *United States v. Taylor*, No. 17-20791, 2020 WL 5200956, at *3 (E.D. Mich. Sept. 1, 2020) ("There is no indication that Taylor's mild asthma, especially 'in light of his relatively young age [30 years old] and access to medication,' is an illness with an 'end of life trajectory.'"). Moderate or severe asthma is a condition that the CDC recognizes as one that *might* lead to a higher risk of severe illness from Covid-19. [CDC Risk Factors.](#)

The Presentence Report makes no mention of Edwards even having asthma. (PSR ¶ 39). The PSR is dated Nov. 21, 2019. (*Id.* at 1). In prison, Edwards has been diagnosed with both mild, intermittent asthma and moderate, persistent asthma. (Ex. 2: Medical Records, at

16, 17, 38, 41, 52). These diagnoses occurred one month apart. (*Id*. at 16, 38). On August 19, 2020, Edwards had a "normal" chest x-ray and his "[l]ungs are clear." (Ex. 3, at 16, 79). In response to Edwards's complaints, doctors have prescribed him at least two medications, including an inhaler, for asthma. (*Id*. at 4, 41). The Bureau of Prisons is appropriately treating this condition.

Even assuming that Edwards currently has moderate asthma, this treated condition is not an illness with an end of life trajectory. *See*, *United States v. Edwards*, No. 15-20564, 2020 WL 4816193, at *2 (E.D. Mich. Aug. 19, 2020) ("it is unclear whether this [moderate asthma] puts Defendant at a higher risk for severe illness from the virus."); *United States v. Hansberry*, 2:15-cr-20217 ECF No. 291, PageID.7424-7425 (E.D. Mich. Sept. 22, 2020) ("Well-controlled moderate asthma alone is not a 'sufficiently extraordinary or compelling [reason]' such that compassionate release is []necessary."); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020) (finding Murphy's asthma, which is controlled by an inhaler, does not satisfy the definition of medical condition under USSG § 1B1.13's

16

application note.). So too with Edwards's asthma. This condition is not an extraordinary and compelling reason to grant his motion.

**Obesity.** In his request to the warden, Edwards did not assert obesity as a basis for compassionate release so he has not exhausted this issue. (ECF No. 24, PageID.111–114.) The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the Bureau of Prisons has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the Bureau of Prisons denies or fails to act upon the request. *United States v. Alam*, 960 F.3d 831, 835–36 (6th Cir. 2020). So when "the factual basis in the administrative request and the motion before the court are different, a defendant does not satisfy the exhaustion requirement because he does not give the BOP an opportunity to act on the request before [he] brings his request to the courts." *United States v. Asmar*, No. 18-20668, 2020 WL 3163056, at *3 (E.D. Mich. June 5, 2020). The best reading of Sixth Circuit law is that § 3582(c)(1)(A) requires issue-specific exhaustion. As the Sixth Circuit has explained, an exhaustion statute "written in more general terms" commands "issue exhaustion if an agency's rules so require." *Island Creek Coal Co. v. Bryan*, 937 F.3d

738, 746–47 (6th Cir. 2019) (citing Woodford v. Ngo, 548 U.S. 81, 90–91 (2006)). Section 3582(c)(1)(A) is just such a statute, and the agency's rules here require an inmate to identify "[t]he extraordinary or compelling circumstances that the inmate believes warrant consideration" for compassionate release. 28 C.F.R. § 571.61(a)(1). Thus, an inmate seeking relief based on a combination of Covid-19 and a particular medical condition or conditions must first make *that* specific request to the Bureau of Prisons before seeking relief in court. *Island Creek Coal Co.*, 937 F.3d at 746–47; *see Alam*, 960 F.3d at 834–36 (emphasizing the issue-specific nature of exhaustion under § 3582(c)(1)(A)). As for obesity, Edwards has failed to do that here.

All the same, the CDC recognizes obesity (BMI of 30 or greater) as a condition that puts persons at an increased risk for severe illness from Covid-19. CDC - Certain Medical Conditions Edwards lists his height and weight in his motion. (ECF No. 26, PageID.131.) And his medical records include a reference to obesity. (Ex. 2, at 2). But this is unclear at best. His PSR identifies his height as 5 feet, 9 inches. (PSR ¶ 39). His medical records identify his height as 5 feet, 9 inches several times. (Ex. 2, at 20, 32, 46). These same records also list a height of 5 feet, 7 inches.

(*Id*. at 1, 46). In prison, his weight has fluctuated from 180–188 pounds. (*Id*. at 1, 20, 46). Plugging in the height (5'7) and weight (188) most favorable for Edwards, his BMI is 29.4 and below the threshold for an obesity diagnosis. CDC Adult BMI Calculator At 5 feet, 9 inches and 180 pounds, his BMI is 26.6. Edwards therefore falls into the category of overweight, which is a condition that *might* lead to a higher risk of severe illness from Covid-19. CDC - Certain Medical Conditions

Edwards's weight (and its fluctuation) simply does not satisfy the definition of a medical condition that constitutes an extraordinary and compelling reason: either a terminal illness, or a serious medical condition that substantially diminishes his ability to provide self-care in prison from which he is not expected to recover. USSG § 1B1.13 cmt. n.1. Unlike an inmate with a BMI of 50, the fluctuation of Edwards's weight and corresponding change in his BMI show that his condition is not one that is permanently fixed in a problematic range.

***Dangerousness.*** Edwards also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus

19

prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-cr-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen [spikes in shootings and murders](#).

Because Edwards's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). In 2011, Edwards and a codefendant committed an armed robbery that involved stealing a purse at gunpoint. (PSR ¶ 27). The court sentenced Edwards to prison. In a separate case, a state court also sentenced him to 60 days jail for attempted carrying a concealed weapon and use of a narcotic or cocaine in December 2012. (PSR ¶ 26). Yet those sentences did not deter him from carrying a loaded firearm to a drug deal in this

case. He remains a danger to the community if released. This factor forecloses relief here.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Edwards eligible for compassionate release, the § 3553(a) factors should still disqualify him.

***Offense conduct.*** This case began with an undercover police officer negotiating the purchase of ecstasy online. (PSR ¶ 8). On October 31,

2018, an undercover police officer, using Facebook's messenger application, arranged a meeting to buy 15 ecstasy pills. (ECF No. 16, PageID.39–40.) The officer agreed to buy the pills, from someone using C.C.'s Facebook account, at the Save-A-Lot in Flint. (*Id*.).

Just before the arranged meeting, Edwards traveled to the Save-A-Lot in a Chevrolet Traverse. (ECF No. 16, PageID.39–40.) Sitting in the front passenger seat, Edwards was with his relative (the driver) and a friend (C.C.), who sat in the backseat. (*Id*.). Edwards had his firearm, a .22 caliber revolver, with him and placed it beneath his car seat. (*Id*.). The revolver was loaded with eight rounds of ammunition. (*Id*.). After the Traverse entered the Save-A-Lot parking lot, the police swarmed it. (*Id*.). As Edwards stepped out of the car, an officer saw his .22 caliber revolver partially hidden under his car seat. (*Id*.). The officer arrested, handcuffed, and sat Edwards in a police car. (*Id*.). Later, when searching the police car, the officer found a baggie with eight pills of the controlled substance analogue N-Ethylpentylone (pseudo ecstasy) directly under the area where Edwards sat. (*Id*.). Edwards was the only person detained in this police car, and the baggie was not there before Edwards occupied the seat. (*Id*.). On the other side of this coin, the

22

officers searched and found no controlled substances on either the driver or C.C. (*Id*.). Nor did the police find any drugs inside the Traverse. (*Id*.).

*History and characteristics.* Edwards is a 29-year-old father of one child. (PSR ¶¶ 33, 36). He was raised by his mother, in a supportive environment free of abuse and neglect. (PSR ¶ 33). Although he has worked a few jobs for short periods over the last several years, he has not maintained the type of steady employment that provides stability. (PSR ¶¶ 47–53).

In June 2011, Edwards and a codefendant committed an armed robbery that involved stealing a purse at gunpoint. (PSR ¶ 27). About a year later, the court sentenced Edwards, for his lesser role in the robbery, to 18 to 180 months in state prison. (*Id*.). According to online court records, Edwards received credit for 373 days served at his sentencing. Having received parole in June of 2013, Edwards was discharged from parole two years later. (*Id*.).

In a separate case, a state court also sentenced him to 60 days jail for attempted carrying a concealed weapon and use of a narcotic or cocaine in December 2012. (PSR ¶ 26).

*Other § 3553(a) factors.* Edwards's motion should be denied because he has served too little of his sentence. As Edwards himself admits, he has not been in prison long: about four months. (ECF No. 24, PageID.107.). This means he is seeking release after have served less than 25 percent of his sentence. The Court may consider the amount of time served on a sentence in weighing § 3553(a) factors for compassionate release. *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (rejecting the inmate's claim that the court's consideration of the amount of time served was improper when denying compassionate release.). In *Murphy,* the district court denied compassionate release for an inmate who had served only 32 months of a below guidelines, 60-month sentence for possession with intent to distribute heroin. *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020). So too here.

Edwards has been in custody since reporting to BOP on June 30, 2020. His projected release date is in March 2022. Reducing his sentence by over 75 percent would not promote his respect for the law, provide just punishment, specifically deter him, and generally deter others. But it would likely give rise to an unwarranted sentencing

24

disparity. Since his reporting date, Edwards has not even had enough time to meaningfully take advantage of BOP programming.

## III.  If the Court were to grant Edwards's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Edwards's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Edwards's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: November 12, 2020          s/BLAINE LONGSWORTH
Assistant United States Attorney
600 Church St., Flint, MI 48502
Phone: (810) 766-5177
blaine.longsworth@usdoj.gov
P55984

## ***CERTIFICATION OF SERVICE***

I hereby certify that on, November 12, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will electronically serve all ECF participants.

s/Jessica Stanton
United States Attorney's Office

26